**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Neil A. McEwen and
Maxine L. McEwen, married
individuals,

Plaintiffs,

v.

Civil No. 00-231 RHK/RLE
Civil No. 00-357 RHK/RLE
**MEMORANDUM OPINION AND ORDER**

Farm Service Agency and
United States Department of Agriculture,

Defendants.

---

Neil A. McEwen, McEwen Law Offices, Crosslake, Minnesota, for Plaintiffs.

Lonnie F. Bryan, Assistant United States Attorney, Minneapolis, Minnesota, for Defendants.

---

## Introduction

Plaintiffs Neil and Maxine McEwen own farm land in Marshall and Pennington Counties, Minnesota. In November 1998, Plaintiffs made offers to the United States Department of Agriculture ("USDA") to enroll tracts of their land, in both counties, into the Conservation Reserve Program ("CRP"). The CRP is a federal program that pays landowners an annual rental fee for land that is dedicated to certain conservation



FILED MAR - 6 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD MAR - 6 2001
DEPUTY CLERK

practices.[1] The CRP is a USDA program, which is implemented through the Commodity Credit Corporation ("CCC"), and administered by the federal Farm Service Agency ("FSA").

The CRP is a competitive program, and not all offers by landowners to implement conservation practices are accepted; Plaintiffs' offers for each county were rejected. Plaintiffs appealed their rejections to the FSA and National Appeals Division ("NAD"), and have exhausted their administrative remedies. They now seek review by this Court pursuant to 7 U.S.C. § 6999. Currently before the Court are Defendants' Motions for Summary Judgment.[2] For the reasons set forth below, the Court will grant the motions.

**Background[3]**

Plaintiffs own a parcel of farm land in Marshall County, Minnesota, known as tract 3122, and a parcel in Pennington County, Minnesota, known as tract 2964. (Marshall County Pet. for Review of Determination of Agency and J. ¶ 1 ("Marshall

---

[1] The purpose of the CRP is to preserve and improve the soil and water resources of erodible cropland.

[2] Plaintiffs filed two separate requests for review by this Court–one for each parcel of land. Because the two cases are so similar in subject matter and arise out of a similar fact patterns, the Court will address the two cases jointly, noting the differences where appropriate.

[3] For purposes of this motion, the Court views the evidence and the inferences that might reasonably be drawn from it in the light most favorable to the Plaintiffs, the nonmoving party. See Enterprise Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996).

Pet."); Pennington County Pet. for Review of Determination of Agency and J. ¶ 1 ("Pennington Pet.").) In November 1998, Plaintiffs offered both tracts of land for submission into the CRP.

## I. Conservation Reserve Program

The CRP is a voluntary program that, in exchange for the landowner's implementation of a conservation plan, (1) pays the owner an annual rental payment for the period of years specified in the contract; (2) shares with the owner the cost of establishing the conservation practices specified in the conservation plan; and (3) provides technical assistance to aid the owner in carrying out the contract. (Marshall County Admin. R. at 79-80 ("Marshall R.").)

Acceptance of land into the program is based on the type of activities, called conservation practices ("CPs"), that the landowner agrees to implement. (Id. at 81.) The FSA assesses each CP for its value to land or wildlife conservation and assigns the CP a maximum possible environmental benefit index ("EBI") score based on that value. (Id. at 81-86.) The EBI score is based both on factors that are controllable by the landowner, such as the landowner agreeing to plant certain grasses and trees, and factors that are not controllable by the landowner, such as soil composition and the tract's proximity to wetlands. (Id.) A landowner can also control the EBI score by the cost share and rental amounts that the USDA must pay for each tract. (Id.) A landowner's willingness to reduce the USDA's cost share, or the rental amount paid for the land, will increase the

owner's EBI score. (Id. at 86.) Landowners with the highest EBI scores are enrolled into the CRP. (Id. at 86.) Consequently, landowners who want to improve their chances of having their land accepted into the CRP must maximize their EBI scores by engaging in certain CPs, and lowering the USDA's cost share and rental amounts in their offers. (Marshall R. at 133-34.)

Determining which practices a landowner should implement, and how much cost share and rental amount to charge the USDA, can be a complicated process. A landowner tries to maximize the USDA's portion of cost share and rental amount, and minimize its own costs; however, if the EBI score is too low the landowner's offer will be rejected. A landowner, moreover, may not change the offer once it has been rejected by the USDA. 7 C.F.R. § 1410.30. Thus, a landowner has only one opportunity to present its offer to the USDA.

In order to assist landowners in the sign-up process, the USDA set up Natural Resources Conservation Services ("NRCS") offices for each county. (Marshall R. at 79.) The FSA also issued pamphlets and newsletters, and contributed articles to local newspapers explaining the CRP. (Id. at 87, 134-39.) Additionally, FSA created, and made available at county NRCS offices, a fact sheet for the 18th[4] sign-up for the CRP. (Id. at 81.) This five-page fact sheet explained, in detail, how EBI scores are calculated,

---

[4] The FSA offers enrollment into the CRP on a periodic basis and assigns a number to the sign-up opportunity. The sign-up at issue in these cases is the 18th since program inception and will be referred to as the 18th sign-up.

and how to improve an EBI score. Id. The FSA fact sheet also explained that the USDA would pay landowners up to half of the cost of implementing selected CPs, and a rental rate up to a pre-determined maximum for each property. (Marshall R. at 81-86; Pennington R. at 100-105.) The fact sheet advised landowners that they "may bid a lower rental rate to increase the likelihood that their offer will be accepted." (Id.)

The CPs that were described in the FSA materials that were consistent with the location of Plaintiffs' land, and are at issue in both cases, are:

(1) CP-4d: Planting grass, shrubs, and trees for wildlife habitat.

(2) CP-12: Planting a wildlife food plot.

(3) CP-23: Restoration or conversion of farmed land into wetlands.

(4) CP-25: Planting of rare and declining habitat.

(Marshall R. at 81-86; Pennington Admin. R. at 100-105 ("Pennington R.").)

Landowners initiate the enrollment process by going to the county NRCS office and completing a worksheet specifying the CPs they propose to implement. (Id. at 33-34.) FSA and NRCS employees work together at NRCS offices and are available to all landowners to assist in the enrollment process. (See Marshall Ex. 2, at ¶¶ 293-300.) The employees use the worksheet to create a proposed "Conservation Reserve Program Contract"[5] which is then signed by the landowner and constitutes the owner's offer.

---

[5] Although the form's title indicates "Contract," it does not become a contract until accepted and signed by a designated representative of the CCC.

(Marshall R. at 29.) FSA or NRCS employees then review the offer for accuracy, load the data into their computers, and transmit it to the FSA national office. (Marshall Ex. 2 ¶¶ 270-74.) After the deadline for offer submissions has passed, the national office assigns an EBI score to each offer, ranks the offers, and sends the results to the county NRCS office. (Id. at ¶¶ 285-87, 293-99; Marshall R. at 75.) NRCS employees review all of the EBI scores for accuracy, and accept the offers with the highest scores, working down the list until the maximum allowable acreage for each county is reached.[6] (Marshall Ex. 2 ¶¶ 442-449; Marshall R. at 74-75; Pennington R. at 198). The EBI score for the last tract accepted is established as the cutoff and all offers with lower EBI scores are rejected. (Marshall Ex. 2 at ¶¶ 442-45.) The FSA then notifies landowners of CRP acceptance or rejection by letter. (Marshall R. at 27-28; see Pennington R. at 196 (FSA appeal determination referring to letter of rejection).)

## II Plaintiffs' CRP Offers

Mr. McEwen went to the NRCS offices in each county to enroll land into the CRP. (Marshall Pet. at 1, Pennington Pet. at 1.) In both offices, Mr. McEwen told NRCS employees that he wanted to maximize his EBI score. (Id.) After consultation with employees at the NRCS offices, Mr. McEwen selected a combination of CP-4d and CP-12 practices for both tracts of his land and entered the CPs on an "Inventory and

---

[6] The maximum allowable acreage per county is 25% of cropland. 7 C.F.R. § 1410.4.

Certification" sheet, which is provided by the FSA to help create the formal worksheet used to prepare the offers. (Marshall R. at 71; Pennington R. at 52.) Mr. McEwen indicated affirmatively on both sheets that Plaintiffs were not interested in wetland restoration, CP-23. (Id.) After entering the proposed CPs on the formal worksheets, Mr. McEwen entered the annual rental and cost share amounts that he was willing to offer the USDA. (Marshall R. at 68; Pennington R. at 49.) In both cases, Plaintiffs' offered rental rates were below the maximum allowed; however, Plaintiffs proposed that the USDA pay the maximum cost share percentage allowed of 50%. (Marshall R. at 29; Pennington R. at 47.) Those figures were used to prepare the CRP Contract that was sent to the FSA national office for scoring and ranking. (Marshall R. at 64; Pennington R. at 47.)

Both of Plaintiffs' offers were rejected because their EBI scores were below the minimum scores established for each county due to the 25% limit. (Marshall R. at 62-63; Pennington R. at 45-46.) The FSA's letters to Plaintiffs rejecting their offers included explanations of how the EBI scores were computed, the cutoff scores for each county, and the right of appeal to the county FSA committees. (Id.)

Plaintiffs made timely appeals of both decisions. The appeals were rejected because the FSA determined that because Plaintiffs were not disputing the calculation of their EBI scores, and were not disputing the fairness of the regulatory scheme for accepting CRP offers, the decisions were unappealable. (Marshall R. at 22-23;

Pennington R. at 67-68.) The FSA letters rejecting the appeals included a notice to Plaintiffs that they had the right to a review by the NAD, pursuant to 7 C.F.R. § 11.6(1) 2, if they responded within 30 days, and included in their appeals additional factual information as to why they believed the FSA determinations were incorrect. (Id.)

On May 21, 1999, Mr. McEwen sent letters to the NAD appealing the correctness of the FSA determinations on both tracts of land. (Marshall R. at 21; Pennington R. at 64.) In both letters, Mr. McEwen stated "when I signed up this farm, we requested that the points on this farm be maximized under the applicable rules for the sign-up. The plan was submitted without blocking ditches. This resulted in less points and I believe a rejection of the bid." (Id.) Based on these new grounds–blocking ditches–which challenged the accuracy of the data used to determine the land's eligibility, Plaintiffs were granted oral evidentiary hearings in both cases to be conducted by a hearing officer assigned by the NAD. (Marshall R. at 4; Pennington R. at 5.)

## III. Plaintiffs' Administrative Appeal

Plaintiffs had full administrative hearings in both cases on September 29, 1999, and October 26, 1999. (Marshall R. Exs. 2-3; Pennington Exs. 2-3.) Plaintiffs, pursuant to the statutory scheme for appealing the FSA decisions, were afforded the opportunity to call witnesses, introduce evidence, and cross-examine USDA representatives. (Id.) The evidentiary hearings were also conducted on the record. During the evidentiary hearing for Marshall County, Donald Keyes, Program Specialist for the FSA, testified that the

Plaintiffs would not have received a higher EBI score for blocking ditches, but had the Plaintiffs implemented a combination of the CP-23 and CP-25 practices in both counties their offers would have been accepted. (Marshall Ex. 2 ¶¶ 264-71, 413-16.) Plaintiffs argued at both hearings that the NRCS employees, who had assisted them in drafting their offers, were negligent for not informing them about the combination of the two CPs. (Marshall Ex. 3 ¶¶ 436-43; Pennington Ex. 3 at ¶¶ 320-24.)

The hearing officers upheld the FSA rejection without considering the CP-23 and CP-25 combination. (Marshall R. at 118; Pennington R. at 220.) The officers determined that, because the Plaintiffs had not offered this combination in their initial offers to the USDA, the officers could not consider it on appeal. The officers also found that (1) the Plaintiffs had offered to enroll their land under CP-4d and CP-12 practices, (2) their EBI scores were too low to be accepted by the USDA, (3) the Plaintiffs do not dispute the Agency's determinations and calculations, and (4) the Plaintiffs own land in each county which had previously been enrolled in the CRP. (Id.)

## IV. NAD Directors' Review

On December 12, 1999, and January 18, 2000, the directors upheld the hearing officers' decisions in the Marshall County and Pennington County appeals. In both cases, the directors determined that the Plaintiffs had offered the CP-4d and CP-12 practices, and the FSA had correctly calculated the EBI score. In the Pennington County appeal, the director found that Plaintiffs had been given sufficient information regarding

other conservation methods, but had declined to put them in their offer.[7] (Pennington R. at 253.) The Plaintiffs failed to provide any evidence that the EBI score had been calculated incorrectly; thus, the directors upheld the officers' decisions, stating:

> The statute at 7 U.S.C. § 6997(c)(4) provides that the Appellants shall bear the burden of proving that the adverse decision of the Agency was erroneous. The Appellants failed to prove by a preponderance of evidence that the Agency decision was erroneous.

(Marshall R. at 148; Pennington R. at 253.) Because this concluded the Plaintiffs' administrative appeals the Plaintiffs filed, pursuant to 7 U.S.C. § 6999, separate Petitions for Review by this Court for both properties.

## Analysis

### I. Standard of Decision

#### A. Summary Judgment Standard

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court views evidence and the inferences which may be reasonably drawn from it in the light most favorable to the nonmoving party. Enterprise Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996); see also Adkinson v. G.D. Searle & Co., 971 F.2d 132, 134 (8th Cir. 1992). The moving party bears the burden of showing that there is no genuine issue of

---

[7] The Marshall County hearing officer did not make a similar finding.

material fact and that it is entitled to judgment as a matter of law. Enterprise Bank, 92 F.3d at 747; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

B. Administrative Review Standard

Pursuant to the Administrative Procedure Act ("APA"), agency actions should be reversed if they are found to be arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law.[8] 5 U.S.C. § 706; Newton County Wildlife Ass'n v. Rogers, 141 F.3d at 803, 807 (8th Cir. 1998). APA review of agency action is normally confined to the agency's administrative record. Id. The court, in reviewing the administrative action, must consider whether the procedures employed conform to the procedural requirements of the APA, as well as the FSA's own internal procedures and any other applicable statutory requirements. Oglala Sioux Tribe of Indians v. Andrus, 603 F.2d 707 (8th Cir. 1979). The failure by an agency to comply with its own regulations constitutes an action not in accordance with law that must be vacated by the court. Voyageurs Region Nat'l Park Ass'n v. Lujan, 966

---

[8] Plaintiffs contend that this Court should review the Agency decisions de novo. The de novo standard of review is appropriate in cases of, inter alia, statutory interpretation, Shalala v. St. Paul-Ramsey Med. Ctr., 50 F.3d 522, 527 (8th Cir. 1995), or contract interpretation, Burkin v. Office of Personnel Mgt., 120 F.3d 494 (4th Cir. 1997). Plaintiffs have not made any allegations that the FSA misinterpreted a statute. Plaintiffs argue that their CRP offer was a contract, and thus, this Court should review the Agency decisions de novo. A contract, however, requires an offer, consideration, and acceptance. Plaintiffs have failed to provide any evidence that there was consideration given by either party, or that the USDA accepted their offer; therefore, the Court will not review the Agency decision de novo.

F.2d 424, 428 (8th Cir. 1992); Carter v. Sullivan, 909 F.2d 1201, 1202 (8th Cir. 1990).

If the question involves specialized knowledge of the agency, and Congress has vested the agency with discretion in a technical area, the courts should recognize the agency's presumed competence and expertise and uphold the agency's conclusion so long as it is rationally based. Maloley v. R.J. O'Brien & Assoc., Inc., 819 F.2d 1435, 1441 (8th Cir. 1987); Brotherhood of Ry. & Airline Clerks v. Burlington N., Inc., 722 F.2d 380, 381 (8th Cir.1983) ("agency action is arbitrary and capricious only where it is not supportable on any rational basis").

## II. Merits

Plaintiffs argue that the hearing officers should have considered whether (1) a combination of CP-23 and CP-25 would have increased the Plaintiffs' EBI scores, (2) Plaintiffs' land was eligible for a 15-year contract,[9] and (3) the FSA and NRCS employees had a duty to explain the rules and regulations to Plaintiffs when they signed up for the CRP.[10] Plaintiffs assert, however, that the "central issue of the claim" is

---

[9] Plaintiffs argue that, under the regulations, a combination of the CP-23 and CP-25 practices would have made them eligible for a 15-year contract.

[10] Plaintiffs also argue that the hearing officers' decisions were not supported by substantial evidence because they failed to address the issue of whether Mr. McEwen requested a "maximization of his EBI points." (Marshall Pls.' Opp'n Mem. at 5; Pennington Pls.' Opp'n Mem. at 5.) For purpose of this motion, however, the Court finds that there is sufficient evidence that Plaintiffs requested maximization of their points at the NRCS offices.

whether Plaintiffs reliance on FSA and NRCS employees to maximize their points was justified. (Id. at 7; Pennington at 7.)

A. Agency Duty to Maximize Individual CRP Offers

Plaintiffs argue that they relied on the NRCS and FSA employees to "maximize" their EBI scores, and that the employees erroneously failed to inform Mr. McEwen of thc possibility of a CP-23 and CP-25 combination. The general rule, however, is that "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents . . . ." Heckler v. Cmty. Health Serv., Inc., 467 U.S. 51, 63 (1984). The Plaintiffs had the final responsibility for ensuring that their requests for public funds met all the requirements of the program. Id.

In Heckler, the plaintiff relied on a Government agent's erroneous advice to claim a double reimbursement from medicare. 467 U.S. at 66. The Government later determined that plaintiff could not seek double reimbursement from medicare and instituted an action to recoup any overpayments made to plaintiff. Id. Plaintiff sued claiming that it had reasonably relied on the advice of a Government agent in claiming the double reimbursement, such that the Government should be estopped from seeking the recoupment. Id. The Court disagreed, holding that plaintiff was required to reimburse the Government because "[t]here is simply no requirement that the

Government . . . can be expected to ensure that every bit of informal advice given by its agents in the course of such a [complex] program will be sufficiently reliable . . . ." Id. at 64.

Plaintiffs, likewise, should not have simply relied on an NRCS or FSA employee in drafting their offers to the USDA. Plaintiffs were given the necessary information to draft their offers and declined to implement certain CPs. During the application process, Plaintiffs indicated on the Inventory and Certification sheet, used to prepare their final offers, that they were *not* interested in wetland restoration (CP-23) and did not check the box indicating a willingness to plant grasses to establish wildlife habitat (CP-25). Mr. McEwen also signed below the statement affirming that he had read the suggestions to improve EBI scores, that he understood how his EBI score would be computed, and that all EBI factors had been explained to him and he understood that there was no guarantee that the offer would be accepted. (Pennington R. at 202.) It was only at the evidentiary hearing that Mr. McEwen discovered that a combination of two programs he had declined to implement would have raised his score. The Court, however, cannot estop the Government from denying the Plaintiffs' offers because Plaintiffs now claim that the employees should have informed them of the CP-23 and CP-combination. Plaintiffs reliance on NRCS or FSA employees advice did not relieve them of their duty to understand their offers to the USDA.

The Court, therefore, concludes that Plaintiffs' requests to maximize their EBI points neither relieved them of their responsibility to investigate and understand their options under the CRP, nor created an affirmative duty on agency employees to do so in their stead.[11]

Having concluded that the agency did not have an affirmative duty to maximize Plaintiffs' EBI points, as they had requested, the Court also concludes that the FSA decisions not to consider the CP-23 and CP-25 combination in its review were not arbitrary and capricious, and that the decisions were based on substantial evidence.[12] See 5 U.S.C. § 706.

B. Notice and Opportunity to be Heard

Plaintiffs also allege in their Petitions for Review that the directors' review determinations were "made without contact with Plaintiffs nor gave Plaintiffs any opportunity to be heard." (Marshall Pet. at 2; Pennington Pet. at 2.) Plaintiffs do not dispute, however, the adequacy of the thorough evidentiary hearings they participated in prior to the directors' final review. Plaintiffs contend instead that they should have received *another* hearing in their appeals to the NAD directors.

---

[11] Both counties, moreover, reached the maximum cropland allowable under federal guidelines of 25%; therefore, the FSA was without the authority to enroll the Plaintiffs into the CRP after the limits had been reached.

[12] The Court also concludes that the FSA did not err in declining to address whether the Plaintiffs were entitled to a 15-year contract as a result of the CP-23 and CP-25 combinations.

Plaintiffs were afforded all of the procedural due processes established by the NAD; these included on-demand oral hearings, free transcripts of those hearings, explanation of its findings, and the right to request a review on the record by the NAD director. Plaintiffs, nevertheless, allege that the final determination of their claims by the NAD directors violated their procedural due process rights because they were made without contact with the Plaintiffs or an opportunity to be heard. (Marshall Pet. at ¶ 8; Pennington Pet. at ¶ 8).

The constitutional mandate for procedural due process applies only to government actions that would deprive a person of life, liberty, and property interests. See U.S. Const. amend. V. The Constitution's procedural protection of property is "a safeguard of security of interests that a person has already acquired in specific benefits." Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 576 (1972). To have a property interest in a benefit, a person must have more than an abstract need for it or a unilateral expectation of it, he must have a legitimate claim of entitlement to it. Id., 408 U.S. at 577. However, "property interests are not created by the Constitution; rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law, rulings or understandings that secure certain benefits and support claims of entitlement to those benefits." Id.

Plaintiffs have no existing entitlement to the stream of payments that would have resulted had they been enrolled into the CRP; they merely had an expectancy that their

offers would be accepted. Such an expectancy is not a constitutionally recognized property interest that would give rise to mandatory due process either before or after the agency's final determination. What process they are due, therefore, is that which is required by Congressional enactment and agency regulations that pertain to the program in question. Such entitlements, as they pertain to the process for an evidentiary hearing and a director review, are set forth in 7 U.S.C. §§ 6997 and 6998.

Section 6997 requires that the Agency provide notice of the hearing officer's determination and notice of the right to appeal to the director. The director's review is conducted using the "case record, the record from the evidentiary hearing . . . , the request for review, and such other arguments or information as may be accepted by the Director." 7 U.S.C. § 6998. The NAD statutory scheme does not mandate that the Plaintiffs be afforded a full hearing or even an opportunity to be heard by the NAD director. Therefore, the Court finds that the statutory procedural requirements were sufficiently adhered to in the Plaintiffs' administrative appeals, and the Plaintiffs received the benefit of all procedures to which they were entitled.

**Conclusion**

Accordingly, for the foregoing reasons, and based upon all the files, records and proceedings herein, **IT IS ORDERED** that

(1) Defendants' Motions for Summary Judgment (Doc. No. 11 for Civil No. 00-231 and Doc. No. 11 for Civil No. 00-357) are **GRANTED**, and

(2) Plaintiffs' Complaints in Civil No. 00-231, and in Civil No. 00-357, are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

March 6, 2001

RICHARD H. KYLE
United States District Judge

MAR - 6 2001

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995